### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Ron Sauer,

        Plaintiff,

    v.

University Internal Medicine Associates, Inc.

        Defendant.

Case No. 1:06cv264

Judge Michael R. Barrett

### **ORDER**

This matter is before the Court pursuant to Defendant's motion for summary judgment (Doc. 35).   Plaintiff filed a memorandum in opposition (Doc. 55) to which Defendant replied (Doc. 60).  Also pending before this Court is Defendant's motion to strike the affidavit filed by Plaintiff's counsel, Martin McHenry (Doc. 59).  Plaintiff responded (Doc. 61) to which Defendant relied (Doc. 64).

I.    <u>Procedural Background and Facts.</u>

Plaintiff alleges employment discrimination and retaliation and brings this action for compensatory and punitive damages under the Americans with Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA") as well as state law claims under O.R.C. §4112 and violations of the Family and Medical Leave Act ("FMLA").  This court has jurisdiction of this federal question pursuant to 28 U.S.C. § 1331, as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332. (See Doc. 1 and 18).

Plaintiff Ron Sauer ("Plaintiff" or "Sauer") was hired by University Internal Medicine Associates, Inc. ("UIMA") as an accountant in March 1981.  Sauer's Depo. 45.  Plaintiff's employment benefits both the University of Cincinnati College of Medicine and the Defendant UIMA.  Pl. Aff. 4.  UIMA is one of seventeen separate medical departments that work with over 600 clinical faculty members from the University of Cincinnati.  Attachment A, McLarren Affidavit ¶ 3.  UIMA treats approximately 79,000 patients each year and generates $40 million in patient service charges.  Id.  It has a budget of $30 million that is managed by the Budget and Finance Division.  Id.  At the time that Sauer was released from his employment, he was a "Senior Accountant" in the Budget and Finance Division.  Sauer's Depo. 37, 40.

In his position as Senior Accountant, Sauer's primary responsibilities were to oversee the accounting functions for UIMA.  Sauer Depo. 55.  From 1990 to 2004, Sauer reported to his supervisor, Linda Nixon, Director of Corporate Business Operations.  Nixon Depo. 7; Pl. Dep. 17.  During the time that Sauer reported to Nixon, he received positive reviews for his work.  Pl. Aff. 8.  He also received substantial pay increases and was never disciplined.  Id.

Sauer's workday was comprised of varied, but extremely significant, responsibilities such as the practice of reconciliation.  Attachment B, Qualls Affidavit ¶ 5.  Reconciliation is an uncomplicated, two-step process of which step one is to enter the various withdrawals and deposits and step two is to cross-reference the bank account ledgers for the same transactions.  Once reconciliation was complete, the results would be used by UIMA's business managers to determine the amount of money available to the business at any given moment.  Id.  Sauer's additional responsibilities included overseeing the general

2

ledger functions, accounts payable and receivable, and payroll.  Sauer Exh. 3; Sauer Depo. 61-62.

Before 2004, UIMA conducted all of its accounting functions using an older computer system made by IBM ("IBM program").  Sauer Depo. 66.  Sauer was the most experienced and proficient individual on the IBM program.  Id.  Sauer was the only UIMA employee who used this machine on a regular, consistent basis.  Sauer Depo. 64-65, 81-82.  However, in November 2003, UIMA, in consultation and with the approval of Sauer, decided to switch from the old program to a new software program ("PeopleSoft").  Sauer Depo. 6, 85; Holsing Depo. 8.   Unlike under the IBM program, under the new PeopleSoft software, each division within UIMA would have direct access to the accounting information withheld in the system.  Sauer  Depo. 68, 85; Holsing Depo. 8.

UIMA spent the time between November 2003 and April 2004 implementing the new software.  Sauer Depo. 86.  During this time, UIMA sent Sauer to Texas for a three-day seminar to direct him on how to use the new software.  Sauer Depo. 136-138; Sauer Exhs. 9, 10.  Sauer also attended a webcast of another PeopleSoft Seminar.  Sauer Depo. 137-139.  Finally, Sauer was offered internal training to ease the transition from the IBM software to the PeopleSoft software.  Sauer Depo. 142-143.  The new software's implementation was complete and operational by July 1, 2004.  Sauer Depo. 51; Qualls Depo. 12.

Unfortunately, Sauer was diagnosed with prostate cancer on February 25, 2004.  Sauer Depo. 86-87.  Also during this time, UIMA had, in response to the new PeopleSoft software, adopted a new management structure.  Sauer no longer reported to Linda Nixon, as he had since 1990.  Nixon Depo. 6-7.  Under UIMA's new management structure Sauer

3

report to Kathy Qualls, Director of University Business Operations.  Qualls Depo. 7; Qualls Affidavit ¶ 4.  Sauer describes Qualls as "very supportive" and "sympathetic" to his diagnosis.  Sauer Depo. 87.  Sauer also admits that no one at UIMA ever questioned his need to take medical leave for prostate surgery in May 2004 and that his subsequent requests for leave were never denied.  Sauer Depo. 96, 101-102, 104.

Sauer had assisted with the implementation of PeopleSoft until he left for his surgery in May 2004.  Qualls Depo. 12-13.  Sauer returned to work on July 22, 2004.  Id.  The time that he was out equaled approximately eight weeks.  Sauer Depo. 82.  Due to the implementation of PeopleSoft, the job descriptions of the accounting division changed in July 2004.  Qualls Affidavit ¶ 6.  The primary change with respect to Sauer's duties was that his duty to oversee accounts payable and receivable had moved to the financial analyst staff.  Sauer Depo. 52–53.  Sauer resumed his duties with respect to payroll and to reconciliation, though his tools for conducting the latter had changed significantly due to the more efficient PeopleSoft software.  Sauer Depo. 52-53, 55-56; Qualls Affidavit ¶ 6.

At the time that Sauer returned to work from prostate surgery in July 2004, he was not subject to any medical restrictions or limitations.  Sauer Depo. 99  However, Sauer describes that his incontinence was so pronounced that he went through four to five heavy-duty protective pads in one workday.  Sauer Depo. 107, 110.  He further contends that the incontinence has continued to the present and has only improved with the aid of a surgical implant.  Sauer Depo. 106-107, 115-116, 118.  It is the Plaintiff's contention that he and Qualls met several times after July 2004 to discuss his incontinence and that she had stated that stress seemed to aggravate the "problems."  Pl. Aff. 19, Sauer Depo. 190-191.  In addition to incontinence, Plaintiff suffered from fatigue and erectile dysfunction. Sauer

4

Depo. 105-106, 117.

UIMA asserts that Sauer's problems were with his job performance and not with his incontinence.  Qualls explains that it became evident to her, upon Sauer's return from surgery and with the implementation of the PeopleSoft software, that the new system had brought several of Sauer's weaknesses to light.  McLarren Depo. 69-70.  Sauer himself also acknowledges that he had "issues" with the new software.  Sauer Depo. 144.  Both parties agree that Sauer was not completing the reports necessary to perform the reconciliations.  Id.  Sauer admits that, in October 2004, Qualls began to monitor his work daily because she had discovered multiple accounting errors.  Sauer Depo. 162; Sauer Exh. 12.  However, Qualls admitted that Sauer was being overworked and was doing the work of two people.  Qualls Depo. 41-42; Sauer Depo. 190-192.

On November 3, 2004, Qualls met with Sauer to discuss the problems he was experiencing with the new software.  Sauer Depo. 166-167; Sauer Exh. 14.  She discussed with him the necessity that he timely and accurately balance the books.  Sauer Exhs.14, 18.  She instructed Sauer to develop a process that would ensure timeliness and eliminate mistakes.  Qualls Depo. 23; Sauer Exh. 18.  The details of this meeting were later memorialized in a memorandum.  Id.  However, the meeting did not resolve the problems.

On November 9, 2004, Qualls sent a memorandum to Sauer detailing the new errors and restating the resolutions of the November 3 meeting.  Sauer Depo. 166; Sauer Exh. 12; Qualls Depo. 20.  At this time, Sauer was four months behind on the reconciliations.  Sauer Depo. 166.  Sauer admits that he had permitted banking errors, wire posting errors, double postings of credit card amounts, inaccurate deposits and other errors. Sauer Depo. 167-171; Sauer Exh. 13.  Defendant contends that these inaccuracies

5

amounted to a monetary total in the millions of dollars.  Sauer Depo. 247-249.  According to Defendant, one particular mistake  caused $1 million to be improperly deducted from UIMA's account ledger.  Sauer Depo. 248- 249; Sauer Exh. 13.  The November 9th memorandum to Sauer from Qualls set December 15 as the deadline for Sauer to complet the backlog of reconciliations.  Sauer Depo 172; Sauer Exh. 12; Qualls Depo. 21.  The November 9 memorandum again stressed the importance of accuracy and offered assistance to Sauer in making daily cash postings.  Sauer admits that he agreed to this deadline but failed to meet its requirements.  Sauer Depo. 172.

Additionally, around this same time, Qualls became aware that UIMA was being charged a late of $651.02 due to Sauer's failure to pay a bill on time.  Sauer admitted that he failed to timely pay this bill.  Qualls Depo. 181; Sauer Exh. 15.  Qualls also uncovered that some of Sauer's actions were resulting in UIMA's asset balance not being in sync with the fund balance and that Sauer had not been properly depreciating UIMA's fixed assets over time. Sauer Depo. 155-156, 159.

Following Sauer's failure to meet the December 15, 2004 deadline to make the reconciliations current, Qualls notified her supervisor, Vance McLarren, Chief Administrative Officer and Executive Director of UIMA.  McLarren Depo 7-8; Qualls Depo. 40.  Concurrently, Niel Holsing, the manager in charge of UIMA's computer operations, also expressed concerns to McLarren regarding Sauer's performance.  McLarren Depo. 20.  McLarren was informed by Qualls of the many mistakes and missed deadlines by Sauer.  Sauer Exh. 18; Qualls Affidvait Exh. 1.  While Sauer argues that the characterization of him as an employee is not fair, he does not dispute the material allegations.  Sauer Depo. 44.  McLarren was also informed by Linda Nixon, Sauer's past

6

supervisor, that Sauer experienced intermittent problems with accuracy during her supervision of Sauer.  Sauer contends that characterization contradicts the positive reviews he received while under the supervision of Nixon.  Qualls Depo. 41-43; Sauer Depo. 42, 190-192.  The culmination of these conferences was that Nixon, Qualls and McLarren concluded together that Sauer should be transferred into a position with less responsibilities.  Sauer Depo. 189 -190; Qualls Depo. 38, 44 -45.  The position agreed to was a payroll position under the supervision of Nixon.  Id.

On February 9, 2005, Qualls met with Sauer to discuss the decision to reassign him. Qualls reports that she explained the transfer as an effort to reduce the stress and therefore reduce his "problems."  Pl. Aff. 21, Sauer Depo. 189, 190, 195.  As a follow-up to this meeting, McLarren met with Sauer on February 10, 2005 to discuss, first, his failures as Senior Accountant and, two, to discuss his transfer to the payroll position.  McLarren Depo. 15.  Sauer reports that he was at first excited about the prospect of being transferred and having reduced stress. He also realized a change needed to be made. Sauer Depo. 192.  Sauer reports that it was his understanding, from his meeting the day before with Qualls, that he would be receiving a pay increase rather than a pay decrease.  Sauer Depo. 199-201.  However, Sauer became aggravated when he was informed by McLarren that the transfer would mean a decrease in salary.  Id. at 199, 207-208; Sauer Exh. 20. Sauer reports to have been further aggravated by the fact that McLarren asked how his "problems" were as soon as he entered the meeting.  Sauer then became upset and complained that he would be better off with a severance package.  Id.

At the February 10, 2004 meeting, McLarren offered Sauer a salary allegedly calculated by the same objective formula used to set the pay rate for all UIMA employees.

7

McLarren Depo. 29; McLarren Aff., Exh. 1.  The formula takes into account the pay received by other Financial Analysts in the Cincinnati region with similar education and experience.  McLarren Depo. 31.  With Sauer's education and experience, it was concluded that he should be paid a salary of $67,000.  Id.  This amount is allegedly $10,000 *more* than the highest paid Financial Analyst at UIMA.  Id.  Sauer's previous salary was $71,000.  Id.  Therefore, the decrease in pay for Sauer's new position would have been $4,000 annually.  Sauer contends that McLarren explained to him that he could not continue to be paid his same salary because it would be unjustified to the other employees who worked the same job.  Sauer Depo. 200; Pl. Aff. 24.  At this point, Sauer alleges that he claimed to be experiencing discrimination based on his age and left the meeting.  Id.  Following the meeting, Sauer alleges that McLarren did not grant his requests to obtain a copy of the chart showing the justification for his proposed $67,000 salary.  Id.

On February 21, 2005, Sauer and McLarren met again to discuss Sauer's decision whether or not to accept the transfer.  Sauer Depo. 223; Sauer Exh. 21.  Sauer reports that he arrived at the meeting with the intent to accept the new position and that he did, in fact, accept the new position and the reduced salary, but that the tone of the meeting changed when he raised the issue that he had felt discriminated against for his age and disability by Qualls.  Sauer reports that he raised this issue out of fear that the discrimination would continue once McLarren left the employment of UIMA, which he was soon scheduled to do.  Sauer Depo. 211-216, 220, 225, 227-232.  Plaintiff alleges that, at no point in the meeting, did he change his mind and decide to decline the offer for the new position.  Pl. Aff. 33.  However, McLarren indicates that Sauer was unwilling to accept the lower salary and that McLarren twice confirmed Sauer's refusal to accept the new position.  McLarren

8

Depo. 59-65. Sauer was then terminated during the meeting.  McLarren had previously prepared a termination letter in case Sauer refused to accept the new position and pay cut. McLarren handed this termination letter to Sauer during the meeting.  In the letter, Sauer was offered a severance package in exchange for a release of claims agreement.  Sauer Depo. 223, Sauer Exh. 21.  Sauer declined to sign the agreement and was terminated from his employment at UIMA.

      II.    <u>Defendant's Argument</u>.

Defendant's Motion for Summary Judgment raises two questions: (1) whether Plaintiff's state law claims are time-barred by the statute of limitations and (2) whether Plaintiff's federal law claims are substantively without merit.  More specifically, Defendant argues that Plaintiff cannot make a *prima facie* case of age discrimination because he was not replaced by a substantially younger person; that Plaintiff has failed to identify a similarly-situated and substantially younger employee who was treated more favorably than him; and, in the alternative, Plaintiff has failed to establish that his poor job performance was pretextual to the Defendant's alleged discrimination.  Defendant further argues that Plaintiff cannot make a *prima facie* case of state and Federal disability discrimination because he is not disabled; that Plaintiff was not substantially limited in one or more of his major life activities, and is thus not disabled as a matter of law; and, in the alternative, that Plaintiff has failed to establish that his poor job performance was pretextual to the defendant's alleged discrimination.  Additionally, Defendant argues that Plaintiff can not establish a *prima facie* claim of FMLA discrimination.  Finally, Defendant argues that Plaintiff's retaliation claims are without merit as the decision to terminate the Plaintiff was made prior to the time that he engaged in any protected activity; and that Defendant had

9

no knowledge that Plaintiff was going to engage in protected activity at the time that it made its decision to terminate the plaintiff.

Plaintiff does not oppose Defendant's motion as it relates to Count VI and VIII of Plaintiff's Amended Complaint, the state law age discrimination claim and the FMLA claim. Plaintiff, however, opposes the remaining arguments in Defendant's motion. Doc. 55, p3.

III.   Analysis.

A.   Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

10

"In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also *L.S. Heath & Son, Inc. v. AT&T Information Sys., Inc.,* 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir.), cert. denied, 506 U.S. 832, 121 L. Ed. 2d 59, 113 S. Ct. 98 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Beatty v. UPS,* 267 F. Supp. 2d 823, 829 (D. Ohio 2003).

B.    Age Discrimination in Employment Act

The Age Discrimination in Employment Act ("ADEA") prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a).  The *McDonnell Douglas* burden-shifting framework for circumstantial-evidence cases has been applied in the context of claims brought under the ADEA.  *Grosjean v. First Energy Corp*., 349 F.3d 332, 335 (6th Cir. 2003).

11

In order to establish a *prima facie* case of age discrimination under the *McDonnell Douglas* framework, a plaintiff must show that: (1) he is a member of the protected class, that is, he is at least forty years of age; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by someone substantially younger or was treated differently from similarly situated employees outside the protected class. *Mitchell v. Vanderbilt University*, 389 F.3d 177, 181 (6th Cir. 2004); McDonald v. Union Camp Corp., 898 F.2d 1155, 1160 (6th Cir. 1990); Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995). *See also O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996). Once these elements are met, the defendant must then offer a legitimate explanation for its action. *Mitchell*, 389 F.3d. at 184. If the defendant satisfies this burden of production, the burden shifts to the plaintiff to introduce evidence showing that the proffered explanation is pretextual. *Id.* Although the burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007) *citing Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

In Defendant's motion for summary judgment, Defendant only challenges the fourth prong of the test, that Plaintiff was replaced by someone substantially younger or was treated differently from similarly situated employees outside the protected class. Defendant asserts, and the Plaintiff does not contest, that Sauer was replaced by someone who was approximately five years and seven months younger than Sauer was. See McLarren Aff, ¶16. The Sixth Circuit has found that a replacement who is six years or less

younger than the plaintiff is not, as a matter of law, substantially younger for purposes of an ADEA *prima facie* case.  *Grosjean v. First Engery Corp*, 349 F.3d 332, 340 (6th Cir. 2003).

The next question then is whether Plaintiff was treated differently from similarly situated employees outside the protected class.  As the Sixth Circuit first explained in *Mitchell v. Toledo Hosp*., 964 F.2d 577 (6th Cir. 1992), "it is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly situated in all respects." 964 F.2d at 583.  To be "similarly situated," the individuals with whom the plaintiff seeks to compare his treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  *Id.*

Then the Sixth Circuit further explained in *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998), "the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" 154 F.3d at 352 (emphasis in original) (citation omitted).  However, the *Ercegovich* Court then stated: "A *prima facie* standard that requires the plaintiff to demonstrate that he or she was similarly-situated in every aspect to an employee outside the protected class receiving more favorable treatment removes from the protective reach of the antidiscrimination laws

employees occupying 'unique' positions, save in those rare cases where the plaintiff produces direct evidence of discrimination. . . . a plaintiff whose job responsibilities are unique to his or her position will *never* successfully establish a *prima facie* case . . .". *Id.* at 353. Finally, in *Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000), the Sixth Circuit explained that "this Court has asserted that in applying the standard [that plaintiff must show that he is treated differently than similarly situated employees from outside the class] courts should not demand exact correlation, but should instead seek relevant similarity." 209 F.3d at 601. *See also Clayton v. Meijer, Inc.,* 281 F.3d 605, 610-611 (6th Cir. 2002). The *Clayton* Court found that "the employees to whom the plaintiff seeks to compare himself must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Clayton*, 281 F.3d at 611. Stated differently, the plaintiff and his proposed competitor must have engaged in acts of comparable seriousness. *Id.*

Plaintiff has failed to put forth any evidence that he was treated differently from similarly situated employees outside the protected class. He has presented no evidence of any employee under Quall's supervision, or anyone else's supervision for that matter, that made the type of errors that Plaintiff has admitted to making or who was months behind on completing reports. Plaintiff argues that this lack of evidence is due to Defendant's failure to properly respond to interrogatories and request for production of documents. In essence, Plaintiff argues that he is entitled to the information that would support Defendant's explanation that Plaintiff's pay had to be cut in order to maintain parity with his new "peer group," i.e., those staff accountants and financial analysts whose

14

positions are similar to that of the new position created for Plaintiff.  See Doc. 61.  Plaintiff's counsel requested, with respect to each peer, his or her date of birth, date of hire, pay rate, the date of each change in pay rate and the reason for the change in pay rate. Additionally, Plaintiff's counsel requested documents relating to each peer's performance, qualifications, discipline and compensation.  Defendant objected to these requests. Plaintiff argues that since this information was never provided by the Defendant that Plaintiff is entitled to an "adverse inference" which would preclude summary judgment. *See Clay v. United Parcel Service, Inc.* 2007 U.S. App. LEXIS 20945 (6th Cir. 2007).

The problem facing Plaintiff in this situation is that it appears that no one is similarly situated to him.  He is the Senior Accountant and there is no evidence that there were other Senior Accountants under Quall's supervision who could be similarly situated.  This is the exact situation contemplated by the Court in *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998).  Thus, the Court finds that the other accountants and financial analysts that were to become Plaintiff's peer group could constitute a summarily situated comparator.  Based on this holding, the Court agrees that Plaintiff is entitled to an adverse inference.  Had Defendant responded to the request for documents relating to each peer's performance, qualifications, discipline and compensation, Plaintiff may have had evidence that he was treated differently than similarly situated comparators. Thus, for purposes of this motion, Plaintiff has established a *prima facie* case of age discrimination.

As the burden shifts to Defendant to set forth a legitimate nondiscriminatory reason for the demotion, subsequent pay cut, and termination, Defendant has established that such reason was due to Plaintiff's performance issues.  In fact, Plaintiff has admitted to

15

having performance issues. Now, the burden shifts back to Plaintiff to show that the poor performance issues was pretextual to the age discrimination.

Generally, to show pretext, a plaintiff must demonstrate "that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007) *citing Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (*quoting Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). Based upon Plaintiff's own admissions, there is no genuine issue that the proffered reason has a basis in fact and was sufficient to warrant the challenged conduct. However, the Court must evaluate whether the proffered reason did not actually motivate the challenged conduct. Plaintiff argues that there are three adverse actions, the demotion, the salary reduction, and the termination. Defendant then asserts that the reason for all three adverse actions was the same, i.e., Plaintiff's poor performance issues. Plaintiff disagrees with this and asserts that the reason given by Defendant for the salary reduction was to create parity among Plaintiff's peer group and the reason for the termination was because he refused the new demotion and salary reduction.

Plaintiff cites to the record that McLarren told Plaintiff that the salary reduction was a joint decision between himself, Qualls and Nixon when, in fact, Nixon opposed any salary reduction and that Plaintiff had refused the newly created position and salary reduction when, in fact, he had accepted both. Plaintiff argues that this falsity is sufficient to support a reasonable inference of pretext. *See Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1081-1081 (6th Cir. 1994). Nixon admitted in her deposition that she had conversations with McLarren about the salary reduction. And even though she disagreed

16

with it she was able to persuade McLarren and Qualls from reducing the Plaintiff's pay by $10,000 to only $4,000. (Nixon Depo. 25-26).  Thus, the statement that it was a "joint decision" is not one that the Court necessarily finds to be false and is insufficient to establish pretext.  However, there appears to be a question of fact as to whether or not Plaintiff accepted or rejected the demotion and salary reduction.  Drawing all reasonable inferences in favor of the nonmoving party as this Court is required, the Court finds sufficient evidence of pretext as to the salary reduction and termination; however, the Court finds that Plaintiff has failed to show pretext as to the demotion wherein Plaintiff admits to making mistakes and being excited about the new position.

C.      Americans with Disabilities Act and O.R.C. §4112[1]

The *McDonnell Douglas* burden-shifting analysis is applicable to employment claims brought under the Americans with Disabilities Act ("ADA") as well.  *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1184-85 (6th Cir. 1996).  In order to establish a *prima facie* case of disability discrimination, the plaintiff must prove that "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced."  *Id.* at 1185-1186.  "Proof of these five facts, in the absence of an explanation by the employer, creates a mandatory inference

---

[1]Given the similarity of the language used in the ADA and Chapter 4112, the Ohio Supreme Court has held that federal regulations and case law are applicable to disability discrimination claims brought under Chapter 4112. *Columbus Civil Serv. Comm. v. McGlone*, 697 N.E.2d 204, 206-207 (1998).  Thus, the two will be reviewed together.

that the employer intentionally discriminated against the disabled individual by taking an adverse employment action 'solely' because of his or her handicap." *Id.* Once these elements are met, the defendant must then offer a legitimate explanation for its action. *Monette*, 90 F.3d at 1186. If the defendant satisfies this burden of production, the burden shifts to the Plaintiff to introduce evidence showing that the proffered explanation is pretextual. *Id.*

Defendant argues that Plaintiff can not establish that he is disabled or that he was discharged solely because of his disability. In response, Plaintiff argues that his "cancer, and the anatomical loss resulting from its treatment (removal of prostate), affected the major life activities of controlling waste elimination and reproduction." Doc. 55, p 17.

Under the ADA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A) . The ADA does not define "major life activities"; however, its regulations, promulgated by the EEOC, define "major life activities" as the basic activities that the average person can do with little or no difficulty, such as "walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1996). "[S]ubstantially limits" means the inability to perform a major life activity, or a significant restriction of the ability to perform a major life activity as compared to the general population. See id. § 1630.2(j)(1).

In determining whether an individual is substantially limited in a major life activity, the court should consider: (1) the nature and severity of the impairment; (2) the duration of the impairment; and (3) its long-term impact. Whether a particular impairment constitutes a disability depends less on the nature of the diagnosis of the impairment than

18

it does upon the effect the impairment has on a particular individual.  *Hensley v. Baptist Hosp.*, 1997 U.S. Dist. LEXIS 22515, 14-15 (D. Tenn. 1997)(citations omitted).  In *Hensley*, like this case, the evidence is undisputed that the plaintiff suffers from incontinence.  There the Court found the following:

> [The] plaintiff is, however, able to effectively cope with this medical condition by wearing "Depends" and by taking a change of clothes in case of accidents. The plaintiff is able, and has at all times been able, to perform all of the facets of her job as an LPN without ever requesting any sort of accommodation by her employer. Likewise, the plaintiff is able to engage in major life activities including walking, working, and caring for herself.  Even if plaintiff has established that continence is a major life activity, plaintiff has failed to set forth sufficient evidence to create a genuine issue of material fact that her incontinence substantially interferes with this major life activity or any other. As a result, plaintiff cannot meet her burden of proof that her medical condition of incontinence is a disability pursuant to the ADA.

*Hensley v. Baptist Hosp.,* 1997 U.S. Dist. LEXIS 22515, 17-19 (D. Tenn. 1997).  This holding is consistent with *Farmer v. National City Corp.*, 1996 U.S. Dist. LEXIS 20941, 16-17 (S.D. Ohio 1996) wherein Judge Holschuh found that "[Plaintiff] has failed to identify any 'major life activity' which has been affected by either the cancer or the resulting impotence or incontinence."

Plaintiff cites to *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999) arguing that the Court held that controlling waste is a major life activity.  However, the Sixth Circuit did not make such a clear holding.  In *Workman,* the Sixth Circuit held that "[t]he jury *could have decided* that controlling one's bowels is a major life activity. . . 29 C.F.R. § 1630.2(j)(1)(ii), if they chose to credit evidence that she needed to be free to go to the bathroom whenever she felt the urge as an important element of her 'retraining'." *Id.* (emphasis added).  *But see, EEOC v. Browning-Ferris, Inc.*, 262 F. Supp. 2d 577, 583 (D.

Md. 2002)("In the instant case there is evidence adequate to establish that Ms. Brown's Crohn's Disease is an actual disability under the ADA -- i.e., the disease substantially limits her in the major life activities of moving her bowels and eating."); *Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378, 384 (3d Cir. 2004)(waste elimination is comparable to other life-sustaining activities such as breathing, eating, or drinking, all of which have been held to be major life activities within the statute).

Plaintiff also relies on *Bragdon v. Abbott*, 524 U.S. 624, 639 (1998) to support his argument that reproduction is a major life activity for the purposes of the ADA.  The Sixth Circuit has determined that whether a person suffers a disability must be determined on a case-by-case basis. *Taylor v. United States Postal Service*, 946 F.2d 1214, 1217 (6th Cir. 1991).  In light of the above cited cases and the facts as presented here, this Court finds that Plaintiff was not disabled.  The Court will first address the major life activity of reproduction.  Although the Supreme Court has found that reproduction is a major life activity in *Bragdon v. Abbott*, 524 U.S. 624 (1998)[2], the facts of this case are dissimilar to those in *Bragdon* wherein a HIV positive plaintiff was substantially limited in the major life activity of reproduction.  Therein, the Court stated: "The Court's evaluation of the medical evidence demonstrates that an HIV-infected woman's ability to reproduce is substantially limited in two independent ways: If she tries to conceive a child, (1) she imposes on her male partner a statistically significant risk of becoming infected; and (2) she risks infecting

---

[2]The Supreme Court did not state whether this holding would apply only in the limited circumstances of an HIV infected person or if it would apply more broadly. Although this Court is of the view that it should be limited, this Court is not in a position to challenge the holding in *Bragdon v. Abbott*, 524 U.S. 624 (1998).  Thus, the Court treats reproduction as a major life activity.

her child during gestation and childbirth, i.e., perinatal transmission." *Bragdon v. Abbott*, 524 U.S. 624, syllabus (1998).  In the present matter, Plaintiff's prostate cancer and residual incontinence are not impairments that are transmittable to one's partner or child. Furthermore, Plaintiff has pointed the Court to no evidence that Plaintiff is unable to reproduce or that he is infertile, only that Plaintiff experiences urine leakage during intercourse.  The fact that Plaintiff may have to wear a condom during intercourse or see a fertility specialist to reproduce[3] does not constitute a significant restriction on the manner in which Plaintiff performs this major life activity.

The Court also finds that Plaintiff's inability to control waste, i.e., his incontinence, even if this Court found it to be a major life activity, was not substantially limited.  As in *Hensley, supra*, the Plaintiff here is able to effectively cope with this medical condition by wearing protective padding and by carrying a change of clothes in case of accidents. The Plaintiff has been able, at all times, to perform his job and he returned to work after his surgery without any restrictions from his doctor.  Furthermore, Plaintiff never requested any sort of accommodation.

Plaintiff argues, in the alternative, that he is disabled because he had a record of being disabled. See 42 U.S.C. § 12102(2). "A record of impairment means an individual has a 'history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002)(quoting 28 C.F.R. §35.104(3)).  However, any impairment

---

[3]There is no evidence in the record to suggest that a fertility specialist would even be necessary.

that Plaintiff suffered from was either temporary[4], i.e. his cancer and required surgery, or did not substantially limit a major life activity as stated more thoroughly above.

Plaintiff also argues that he is regarded as disabled by Defendant.  The Supreme Court has held that to be "regarded as" disabled "it is necessary that a covered entity entertain misperceptions about the individual - it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).  Under this portion of the statute, "an individual may invoke the ADA's protection even if he is not, in fact, disabled. The breadth of the Act's protection is the embodiment of its drafters' will to stamp out the stereotyping of and discrimination against persons with disabilities in all their forms, even when that stereotyping or discrimination is misplaced."  *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001).  The Sixth Circuit went to state that "in determining who may invoke the protection of the ADA, we do not always look to the individual claiming discrimination; when that individual seeks to proceed under a 'regarded as' theory, we must look to the state of mind of the employer against whom he makes a claim. Under the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent. And, as the district court correctly noted, 'that question - i.e., the employer's motive - is one

---

[4]See *Heintzelman v. Runyon*, 120 F.3d 143, 145 (8th Cir. 1997)(holding the plaintiff's year long recovery from back surgery did not substantially limit the major life activity of working); *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1360 (S.D.Fla. 1999) (holding that physical limitations for a five month period following reconstructive surgery did not constitute a disability).

rarely susceptible to resolution at the summary judgment stage.'" *Id.* The Sixth Circuit, quoting the Supreme Court has added the following:

> In analyzing the "regarded as" prong of the ADA, the Supreme Court recently held: "There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual-it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines*, 527 U.S. 471, 489, 144 L. Ed. 2d 450, 119 S. Ct. 2139 (1999). Thus, an individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties.

*Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001). Here, the Plaintiff has admitted that he was not able to meet the duties of his job. And, he has presented no evidence to this Court that Defendant entertained any misperceptions.

Although it is settled law that an the employer's motive is one rarely susceptible to resolution at the summary judgment stage, it is not a foregone conclusion. A Plaintiff can not simply allege he was "regarded as" disabled and then survive summary judgment without showing more than the mere allegation. Here, Plaintiff admitted that he was repeatedly spoken to about his performance issues and that he did, in fact, have such performance issues. Plaintiff admits to making numerous accounting errors and not performing the reconciliations in a timely manner. In addition, Plaintiff openly discussed his prostate cancer and incontinence with this co-workers and supervisors. Plaintiff argues that he was regarded as disabled because his supervisor, Kathy Qualls spoke to him about the stress of his job and how that may aggravate his incontinence and that during a

23

meeting with McLarren, McLarren asked him how is "problem" was.  These two isolated events do not create an issue of fact when taken with Plaintiff's own admissions that he knew management was concerned about his mistakes and that he was continuing to make those mistakes.  Thus, there is no evidence of any misperceptions.

D.      Disability Retaliation under the ADA and O.R.C. §4112[5]

To establish a *prima facie* case for retaliation under the ADA, a party must demonstrate: (1) he engaged in a protected activity; (2) his engagement in that protected activity was known to his employer; (3) his employer, thereafter, took an adverse employment action against him; and (4) a causal link exists between his engagement in the protected activity and the adverse employment action. *Clark v. City of Dublin*, 178 Fed. Appx. 522, 525 (6th Cir. 2006) *citing Kuriatnyk v. Township of Bazetta, Ohio*, 93 Fed. Appx. 683, 686 (6th Cir. 2004); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (applying the same standard under Title VII).  "A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation . . . . However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) *citing Parnell v. West,* 1997 U.S. App. LEXIS 12023, 1997 WL 271751, *2 (6th Cir. 1997).

Plaintiff alleges that he was retaliated against by being terminated for complaining of age and disability discrimination.  There is no dispute that Plaintiff engaged in a

---

[5]Given the similarity of the language used in the ADA and Chapter 4112, the Ohio Supreme Court has held that federal regulations and case law are applicable to disability discrimination claims brought under Chapter 4112. *Columbus Civil Serv. Comm. v. McGlone*, 697 N.E.2d 204, 206-207 (1998).

protected activity.  However, Defendant only addressed the protected activity of February 21, 2005 wherein Plaintiff asserts that he engaged in protected activity on February 10, 2005 as well.  There is also no dispute that Plaintiff's engagement in that protected activity was known to Defendant.  Finally, there is no dispute that Plaintiff was terminated.  However, the partes do dispute the existence of a causal link between the engagement of the protected activity and the adverse employment action.

The facts of what transpired at Plaintiff's termination are in dispute.  Plaintiff and McLarren met to discuss the demotion and subsequent reduction in pay on February 21, 2005.  Plaintiff asserts that he accepted the demotion and reduction in pay.  Both parties agree that Plaintiff also voiced concerns about age and disability discrimination at which point the dynamic of the meeting degenerated into an argument.  McLarren asserts that Plaintiff refused the demotion and because of this refusal, Plaintiff was terminated.  Plaintiff asserts that he never refused the demotion and at all times had accepted the demotion and reduced pay.   Defendant argues that this factual dispute is immaterial because McLarren had drafted the termination letter prior to this February 21 meeting with Plaintiff and prior to any protected activity taking place by him.  However, Defendant states that this termination was letter drafted prior to the meeting to be used in case Plaintiff refused the demotion.  According to Plaintiff, he never refused the demotion.  It was only after Plaintiff complained of age and disability discrimination that Defendant terminated Plaintiff.

Even if it was Defendant's intent to terminate Plaintiff if he refused the demotion, it is a question of fact as to whether or not Plaintiff did actually refuse the demotion and, even if the Court assumed that Plaintiff did refuse the demotion, it is a question of fact as to what Defendant's intent was at the moment of the termination.  Additionally, although

25

not addressed by Defendant, there exists a question as to whether or not its decision to terminate Plaintiff if he refused the demotion had a causal connection to Plaintiff's protected activity on February 10, 2005.

Because a question of fact exists as to Plaintiff's *prima facie* elements of retaliation, the Court's analysis may end here.

IV.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment (Doc. 35) is GRANTED, in part, and DENIED, in part.  Furthermore, the Court DENIES Defendant's motion to strike the affidavit of Martin McHenry (Doc. 59) as MOOT.

**IT IS SO ORDERED.**

 s/Michael R. Barrett
Michael R. Barrett, Judge
United States District Court